**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRELL CURRY,

        Plaintiff,

    v.

JAMES TILTON, *et al.*,

        Defendants.

_____/

No. C-07-0775 EMC (pr)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

In this *pro se* prisoner's civil rights action, Terrell Curry has sued California government entities for violating his rights under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, as amended and codified in 29 U.S.C. § 794(a) ("Rehabilitation Act"), and sued individual members of the correctional staff for violating his Eighth Amendment rights by being deliberately indifferent to a risk to his safety. Defendants now move for summary judgment and Plaintiff opposes the motion. For the reasons discussed below, the Court will grant the motion. The Court will enter judgment in favor of Defendants.

## II.   BACKGROUND

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to the complaint in this action took place during 2004 through 2006. At the relevant time, Terrell Curry was incarcerated at Salinas Valley State Prison. Defendant Evans was the prison warden. Defendant Ponder was the C Facility captain and then was promoted to be the associate warden for Complex 2, which included C and D Facilities. Defendant

1   J. Caropreso was on duty as a floor officer in Mr. Curry's housing unit in C Facility on April 4,

2   2006.

3   A.      The Disability Facts

4           1.      The Plan For Accommodating Disabled Inmates

5           *Armstrong v. Brown*, N. D. Cal. No. C 94-2307 CW ("*Armstrong*"), is a class action

6   concerning disability accommodations for prisoners and parolees in the California Department of

7   Corrections ("CDCR").  The *Armstrong* "court ordered Remedial Plan" as amended January 3, 2001

8   ("*Armstrong* Remedial Plan") requires the CDCR "to ensure that prisoners and parolees with

9   disabilities are accessibly housed, that they are able to obtain and keep necessary assistive devices,

10  and that they receive effective communication regarding accommodations."  *Armstrong v. Brown*,

11  No. 94-2307 CW, Docket # 1974 (Order filed January 13, 2012).  The *Armstrong* Remedial Plan's

12  standards, categories and criteria regarding inmate placement and disability evaluation were

13  generally reiterated in Salinas Valley State Prison's Operational Procedure No. 37.  *See* Docket #

14  65-1, pp. 3, 8-17, and 44-74 (Ponder Decl., ¶ 2, and Exs. A and C).  The *Armstrong* Remedial Plan

15  provides:

16          The Disability Placement Program (DPP) is the Department's set of
            plans, policies, and procedures to assure nondiscrimination against
17          inmates/parolees with disabilities.  The DPP applies to all of the
            Department's institutions/facilities, all programs that the Department
18          provides or operates, and to all inmates who have disabilities that
            affect a major life activity whether or not the disabilities impact
19          placement.

20          Although the program covers all inmates/parolees with disabilities,
            whether or not they require special placement or other
21          accommodation, it is facilitated in part through "clustering" or
            designating accessible sites (designated facilities) for qualified inmates
22          requiring special placement.  Inmates with permanent mobility,
            hearing, vision, and speech impairments, or other disability or
23          compound conditions severe enough to require special housing and
            programming, will be assigned to special placement in a designated
24          DPP facility.  Inmates with a permanent impairment of lesser severity,
            learning disability, or a kidney disability, may be assigned to any of
25          the Department's institutions/facilities (designated DPP institutions or
            nondesignated DPP institutions) consistent with existing case factors.

26

27  Docket # 65-1, p. 9.

28

United States District Court

For the Northern District of California

At Salinas Valley, there was an Inmate Assistance Program ("IAP") for inmates in the DPP. The IAP allowed physically-limited inmates who had difficulty participating in everyday activities to receive aid from designated inmate workers.  The type of assistance available was based on specific needs and limitations of the inmates.  Examples of the assistance available included assistance in preparation of laundry bags, maintenance of cell cleanliness, scribing assistance, escort to and from the dining room with assistance to carry meal trays, and escort to educational and work programs.  *See* Docket # 65-1, pp. 3, 70-74.

The CDCR used an inmate disability verification form (*i.e.*, a CDC-1845 form) to record an inmate's disabilities.  The form was revised: the February 1999 version (called the "Inmate/Parolee Disability Verification") was superseded by a January 2004 version (called the "Disability Placement Program Verification").  *Compare* Docket # 1 p. 23 *with id.* at 25, 37.

The 1999 version of the CDC-145 had five sections:  § A - reason for initiation of form; § B - categories of disability; § C - disabilities impacting placement; § D - disabilities *not* impacting placement; and § E - additional placement factors and information.  Each of the sections had several boxes that could be checked.  In the 1999 version of the form, § C's "disabilities impacting placement" had these choices:

1. ❑    PERMANENT WHEELCHAIR USER
2. ❑    PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)
        *Cannot* walk 100 yards or up a flight of stairs without pausing *with* the use of aid
        (crutches, prosthesis, or walker).
3. ❑    PERMANENT DEAF/HEARING IMPAIRED . . .
4. ❑    PERMANENTLY BLIND/VISION IMPAIRED . . .
5. ❑    PERMANENT INDISCERNIBLE/NO SPEECH . . .
6. ❑    OTHER IMPACTING PLACEMENT

Docket # 1, p. 23.[1]

When the CDC-1845 was revised in 2004, § C's  "permanent disabilities impacting placement" no longer had a category of "other [disability] impacting placement."  In the 2004 version of the form, § C's "permanent disabilities impacting placement" had these choices:

1. ❑    FULL TIME WHEELCHAIR USER - DPW. . .

---

[1]  In the 1999 version of the CDC-1845, § D had five corresponding categories for less severe versions of the first five categories in § C.

3

United States District Court

For the Northern District of California

2. ❑ INTERMITTENT WHEELCHAIR USER - DPO . . .

3. ❑ MOBILITY IMPAIRMENT - With or Without Assistive Device
(Wheelchairs shall not be prescribed) - DPM
Orthopedic, neurological or medical condition that substantially limits ambulation
(cannot walk 100 yards on a level surface without pause).  Requires lower bunk, no
triple bunk, and no stairs in path of travel.

4. ❑ DEAF/HEARING IMPAIRMENT - DPH . . .

5. ❑ BLIND/VISION IMPAIRMENT - DPV . . .

6. ❑ SPEECH IMPAIRMENT - DPS . . .

Docket # 1, p. 25.[2]  On the 2004 version, neither the § C list of permanent disabilities impacting

placement nor the § D list of permanent disabilities not impacting placement contained any category

mentioning inmates with upper extremity disabilities.

      2.    <u>Mr. Curry's Disability and Requests</u>

      Mr. Curry was injured in November 1997 playing football while in custody at the California

Youth Authority.  Due to that injury, Mr. Curry's "right arm has been paralyzed."  Docket # 1, pp.

10-18 (Curry Declaration (hereinafter "Curry #1 Decl.")), ¶ 2.  The paralysis is a permanent

condition.  *Id.*

      Mr. Curry entered the California Department of Corrections and Rehabilitation ("CDCR")

system in September 2001, and was sent to Pelican Bay State Prison.  Curry #1 Decl., ¶ 3.  While

there, he had difficulties in daily activities and completed a reasonable modification or

accommodation request form.  *See* Curry # 1 Decl., ¶ 3.

      On July 12, 2002, a CDCR official at Pelican Bay completed a CDC-1845 for Mr. Curry that

identified him as having a § C disability impacting placement.  Specifically, he was designated as

being "mobility impaired" and as having an "other" disability "impacting placement."  *See* Docket

# 1, p. 23.  The official noted that Mr. Curry had right "upper extremity weakness/paralysis due to

(R) brachial plexus injury," and was "having problems with showering, eating & dressing."  *Id.*

      Mr. Curry was transferred to Salinas Valley in or about September 2002 and was put in the

DPP.  In the DPP, he "was able to be accommodated by utilizing a shower chair/bench while

---

    [2]  Like the 1999 version, the 2004 version of the CDC-1845  had a list in § D of "permanent
disabilities *not* impacting placement," that corresponded to the categories in § C.  For example, the
speech impairment category in § C for an inmate who "[d]oes not communicate effectively speaking or
in writing," had a corresponding category in § D for an inmate who "[d]oes not communicate effectively
speaking, but does when writing."  Docket # 1, p. 25.

United States District Court

For the Northern District of California

1  showering and receive help from the IAWP when [he had] to carry heavy things to and from places."

2  Curry #1 Decl., ¶ 4.  He received inmate assistance in the IAP until December 30, 2004.  *Id.*

3  According to a chrono – prison parlance for a memorandum – dated February 20, 2003, Mr.

4  Curry and other DPP inmates were notified of the Inmate Assistance Program and Mr. Curry had

5  declined to use it.  Docket # 59, p. 7.  The chrono was put in Mr. Curry's file to document that he

6  had chosen not to participate in the program at this time, with the understanding that he would

7  "remain eligible in the future and can request assistance at a later time."  *Id.*

8  During the 2003-2004 time period, "Salinas Valley medical staff were becoming more

9  familiar with the organization and operation of the Disability Placement Program and the *Armstrong*

10  [R]emedial Plan, including use of the revised" CDC-1845.  Ponder Decl., ¶ 7.

11  On or about December 30, 2004, a new CDC-1845 was completed for Mr. Curry, using the

12  2004 version of the form.  On this CDC-1845, Dr. Bowman did not mark that Mr. Curry had a § C

13  permanent disability impacting placement, and instead improvised a category in § D for permanent

14  disabilities *not* impacting placement – a category that stated, "(R) upper extremity weakness."

15  Docket # 1, p. 25.  The form indicated that Mr. Curry was to be housed in a lower bunk and not in a

16  triple bunk.  *Id.* at § E.

17  As a result of the December 30, 2004 CDC-1845, Mr. Curry lost his "DPP-DPO" code that

18  he received with the July 12, 2002 CDC-1845 and now had no DPP code.  *See* Curry # 1 Decl., ¶¶ 3-

19  5.  Without the DPP code, he no longer was able to receive assistance from the IAP.  *Id.* at ¶ 5;

20  *see* Docket # 59, p. 73.  Correctional officers also declined to call an IAP worker because Mr. Curry

21  was not on the approved list to receive help from the IAP.  Curry # 1 Decl., ¶ 12.  Mr. Curry

22  described how his access to certain things in the prison was restricted from January 2005 - October

23  2006 due to not having a DPP Code:

24  Through this time frame I have had difficulties going to the canteen
   store window trying to carry bags of purchased items with no
25  assistance from anyone causing me pain and much difficulty.  I have
   had to purchase less items from the canteen window, enough so I can
26  be able to carry with one arm.  I wasn't able to carry my laundry to the
   laundry exchange window so I either had to opt not to go to the
27  laundry exchange window or take items I can only carry.  When I have
   to go to the prison law library I'm not able to take all the legal material
28  I need so I'm forced to take only what I can carry or try to carry the

5

United States District Court

For the Northern District of California

1   heavy legal material anyway despite the strenuous pain & difficulties.
2   When I have to do a cell move from one cell to the next, I have been
    force[d] to move and carry all my personal property by myself without
    the assistance of the IAWP.
3

4   Curry # 1 Decl., ¶ 6.

5       Mr. Curry filed an inmate appeal on or about September 13, 2005, asking "to be placed back

6   on the DPP/DPO so I won't be discriminated and receive the assistance I need due to my disability."

7   Docket # 1, p. 29 (errors in source).  The inmate appeal was converted to a reasonable modification

8   or accommodation request, and was denied.  *See* Docket # 1, pp. 27, 28.  On September 27, 2005,

9   Mr. Curry was interviewed by Dr. Bowman, who discussed the situation with Mr. Curry and denied

10  the request.  *See id.* at 13.  The written explanation stated:  "You were seen and evaluated on Sept.

11  27, 2005 by Dr. R. Bowman regarding your request to be designated DPP-DPO.  As was discussed

12  with you, you do not qualify under the CDCR DPP V guidelines (right upper arm extremity

13  disability).  It is clear that you have some disability of the right arm, however, no accommodation is

14  needed."  Docket # 1, p. 27.[3]

15      Dr. Bowman also completed a new CDC-1845 for Mr. Curry on September 27, 2005.  On

16  this form, Dr. Bowman did not mark that Mr. Curry had either a permanent disability impacting

17  placement or a permanent disability *not* impacting placement.  Docket # 1, p. 37.  The form

18  indicated that Mr. Curry was to be housed in a lower bunk and not in a triple bunk.  *Id.* at § E.  In the

19  physician's comment's section at the bottom of the form, Dr. Bowman wrote: "His right upper

20  extremity disability does not qualify under the CDCR-DPP guidelines.  There is no category for

21  upper extremity disability."  *Id.* at § G.  The new CDC-1845, and the denial of the inmate appeal

22  meant that Salinas Valley medical staff determined that Plaintiff did not have a permanent disability

23  which substantially limited his ability to perform a major life activity.  *See* Ponder Decl., ¶ 9; Docket

24  # 59, p. 57 (discovery response from CDCR stating that Curry did not meet the criteria under the

25  DPP and his "upper extremity disability did not impact his major life activities such that the

26  ─────────────────────

27      [3] The Director's Level decision on Mr. Curry's inmate appeal stated that, although Mr. Curry
    did have some disability of his right arm, his condition did not meet the minimum criteria for inclusion
28  in the DPP under the *Armstrong* Remedial Plan.  *See* Docket # 1, p. 32.

**United States District Court**

For the Northern District of California

1   assistance requested in the appeal was necessary"); Docket # 59, p. 61 (discovery response from

2   CDCR stating that it was not the existence of an upper extremity disability, but whether that

3   situation limited the inmate's ability to perform a major life activity, that was relevant to DPP

4   placement).

5          Although he was not in the DPP, Salinas Valley officials granted Mr. Curry several

6   accommodations during the relevant time.  Chronos were issued that allowed him extra time in the

7   shower, use of a shower chair, waist chain handcuffs, work restrictions, a bottom bunk, no triple

8   bunk, an exercise band, an extra mattress, an extra pillow, and a cotton sling/arm brace.  *See* Docket

9   # 1, p. 36; Docket # 58, p. 5; Docket # 65-1, pp. 23, 28-29, 31-32, 36, 41-43.

10         On October 2, 2006, Mr. Curry submitted a reasonable modification or accommodation

11  request form to obtain assistance carrying his heavy property and to obtain a DPP code.  Docket # 1,

12  p. 42.  Dr. Bowman issued a chrono noting the inmate's right arm paralysis and authorizing an

13  inmate assistant "when he needs to carry heavy cumbersome objects which normally require the use

14  of both arms," and a typewriter for legal work.  Docket # 1, p. 44.  Mr. Curry was not given a DPP

15  code, however.

16  B.     The Trip-And-Fall On April 4, 2006

17         As of April 4, 2006, Defendant Caropreso was a floor officer generally familiar with inmate

18  Mr. Curry from his time working in C Facility.  Caropreso knew that Mr. Curry had some problems

19  with one of his arms, although the condition "did not seem to significantly impair his daily living

20  activities, and [Caropreso] recall[ed] seeing him moving around the housing unit, playing handball

21  on the yard, and performing other activities without any significant limitations."  Caropreso Decl., ¶

22  3.

23         On April 4, 2006, C Facility was on modified program while yard and building searches

24  were being conducted.  Under the policy then in effect, any inmate who was out of his cell "was

25  required to be in mechanical wrist restraints and under the direct escort of at least one correctional

26  officer."  McAleavey Decl., ¶ 2.  During a direct escort, a correctional officer "must maintain a

27  physical grasp on the inmate with one hand at all times during the escort, holding either the inmate's

28  arm, shoulder, or mechanical restraints.  This is to ensure the safety of custody staff and the inmate

**United States District Court**
For the Northern District of California

1    during the escort, so that the officer can protect himself or the inmate from physical assault." *Id.* at ¶

2    3.  During such an escort, "security is paramount," and the escorting officer "must maintain a free

3    hand." *Id.* at ¶ 4.  Sometimes, inmates were secured at the waist area during an escort.

4            The restraints available to secure inmates at the waist included waist restraints and a Martin

5    chain.  With waist restraints, "an inmate's hands are individually secured to his left and right hip

6    area by separate mechanical restraints connected to a chain that goes around the inmate's waist.  A

7    less restrictive form of waist restraint that correctional staff occasionally use is called a Martin

8    chain, which connects to the chain in the middle of a pair of mechanical restraints and allows the

9    inmate's hands to move more freely around his waist and body."  McAleavey Decl., ¶ 5; *see*

10   *also* Caropreso Decl., ¶ 4 ("A Martin chain is a length of metal chain that connects to the links in a

11   set of mechanical restraints and goes around an inmate's waist, securing his hands in front of his

12   body while also allowing considerable range of movement.")  With a Martin chain, the inmate can

13   move or position his hands to engage in a variety of activities, including using stair handrails.

14   *See* Docket # 59, p. 44.

15           Officer Caropreso was instructed by the control booth officer to escort Mr. Curry to the law

16   library.  Caropreso went to Mr. Curry's cell on the upper tier, retrieved Mr. Curry, and placed him in

17   a Martin chain.  Mr. Curry took with him to the law library "heavy legal materials" that were in a

18   bag.  Curry #1 Decl., ¶ 13.  (Mr. Curry provides no specifics about the size of the bag or the weight

19   of the materials.)  The Martin chain "placed both hands to be fixed in the front crotch area while

20   trying to carry [his] heavy legal material." *Id.*  As he left his cell in the restraints, Mr. Curry carried

21   a book to an inmate in nearby cell and asked an inmate if he needed anything from the library.

22   *See* Docket # 59, p. 27.

23           The parties disagree on whether Mr. Curry was supposed to be secured in waist restraints or

24   a Martin chain when he was escorted.[4]  A January 30, 2004 chrono authorized "waist chains;" a

25

26          [4] The parties disagree about some of the details of the April 4 escort.  At the summary judgment
     stage, the judge must view the evidence in the light most favorable to the nonmoving party.  Therefore,
27   if evidence produced by Defendants conflicts with evidence produced by Mr. Curry, the judge must
     assume the truth of the evidence set forth by Mr. Curry with respect to that fact.  *See Leslie v. Grupo
28   ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

United States District Court

For the Northern District of California

December 30, 2004 comprehensive accommodation chrono authorized "waist restraints" as a permanent accommodation for Mr. Curry, and a September 28, 2005 comprehensive accommodation chrono did not mention waist restraints. *See* Docket # 65-1, pp. 23, 33; Docket #1, p. 36. Mr. Curry states: "I told defendant Caropreso I have a chrono & that I need the real waist-chain handcuffs which would have placed both hands to my side; I was told by him that it was the same thing." Curry #1 Decl., ¶ 13. In his initial inmate grievance about the fall, Mr. Curry did not mention anything about the wrong kind of restraints being used. *See* Docket # 1, pp. 47-48.[5]

Mr. Curry states that he asked for help carrying his legal materials, and that Caropreso responded that Mr. Curry had to carry his own materials. Curry #1 Decl., ¶ 13-14. Mr. Curry had been carrying his own things since about January 2005 when he was removed from the DPP. *See* Curry #1 Decl., ¶¶ 5-6, 12. As they walked down the tier, Mr. Curry did not complain that he was having trouble moving.

The parties disagree as to whether Caropreso held on to Mr. Curry as he escorted him on the way to the law library, and specifically as they descended the stairs to the lower tier. Mr. Curry presented evidence that Caropreso did not hold on to his arm. *See* Curry Declaration In Opposition to Defendants' Summary Judgment Motion ("Curry # 2 Decl."), ¶ 10*;* Banks Decl. (Ex. G to Curry #2 Decl), ¶ 2).

Mr. Curry fell on the next-to-last-step as he descended the stairs. According to Mr. Curry, due to being in restraints and struggling with his bag of materials, he fell down the stairs. Curry #1 Decl., ¶ 13. Medical assistance was summoned and Mr. Curry was taken to the correctional treatment center. According to Mr. Curry, he hurt his leg, back and shoulder, *id.* at ¶ 17, although he submits no medical records documenting any injury.

---

[5] The inmate appeal was returned to Mr. Curry at the first level with a note about the restraints. The inmate appeals coordinator wrote to him: "Your appeal states you were in handcuffs. The response states you were in Martin chains. There is a big difference between the two. Are you deliberately falsifying your appeal? Or are you contesting the fact that you were in Martin chains?" Curry responded: "To Appeals Coordinator. I am not deliberately (sic) falsifying my appeal. I thought handcuffs were handcuffs when they're at your waist. I don`t even know what "Martin chains" are to use that terminology. My appeal is about falling down the stairs with restraints on, as the terminology is used, with Martin chains on. I made the corrections using the correct terminology. Please process to the second level for review." Docket # 1, p. 53.

United States District Court

For the Northern District of California

Defendant Ponder was "not aware of a history of inmates falling down stairs while wearing mechanical restraints or waist chains at Salinas Valley." Ponder Decl., ¶ 14. Had Ponder become aware that inmates were sustaining injuries as a result of falling down stairs while in restraints or were otherwise in danger of falling down stairs during escorts, he would have taken measures to ensure inmate safety though further training and escort procedure review. After Mr. Curry fell on the stairs, Ponder investigated the incident in response to Mr. Curry's administrative grievances and thought the evidence indicated that Mr. Curry had taken actions to cause his fall down the last two steps. "To prevent a repeat incident, [Ponder] moved Plaintiff to a first tier housing cell" and directed staff to receive refresher training regarding direct escorts of restrained inmates because he was concerned that other inmates might commit similar actions. Ponder Decl., ¶ 13.

Warden Evans had "no personal independent knowledge or recollection of any reports of inmates falling down stairs during [January 1999-January 2007]." Docket # 59, p. 43.

### III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred at a prison in Monterey County, within the Northern District. This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.

### IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") The moving party bears the initial

1   burden of identifying those portions of the record which demonstrate the absence of a genuine issue

2   of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by

3   [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

4   designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324

5   (citations omitted.)  The court's function on a summary judgment motion is not to make credibility

6   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec.*

7   *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be

8   viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the

9   facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

10      On issues as to which the moving party bears the burden of proof at trial -- such as the

11  qualified immunity defense in this case -- he must come forward with evidence which would entitle

12  him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965

13  F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each

14  issue material to his affirmative defense.  *Id.* at 1537.  Once the moving party has come forward with

15  this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of

16  a genuine issue of fact on the defense.

17      A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

18  based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*

19  *McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as

20  opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

21  plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

22  based purely on his belief but on his personal knowledge).  The complaint was signed under penalty

23  of perjury and therefore is considered in deciding the motion for summary judgment.

## V.   DISCUSSION

24

25  A.      ADA/Rehabilitation Act Claim

26              1.      Disability Law Basics

27      Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et seq.* ("ADA"),

28  provides that "no qualified individual with a disability shall, by reason of such disability, be

1   excluded from participation in or be denied the benefits of the services, programs, or activities of a

2   public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

3        Although 42 U.S.C. § 12132 does not expressly provide for reasonable accommodations, the

4   implementing regulations provide that "[a] public entity shall make reasonable modifications in

5   policies, practices, or procedures when the modifications are necessary to avoid discrimination on

6   the basis of disability, unless the public entity can demonstrate that making the modifications would

7   fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The

8   duty to provide "reasonable accommodations" or "reasonable modifications" for disabled people

9   under Title II of the ADA arises only when a policy, practice or procedure discriminates on the basis

10  of disability. *Weinreich v. Los Angeles County MTA*, 114 F.3d 976, 979 (9th Cir. 1997). A plaintiff

11  accordingly bears the burden of establishing the existence of specific reasonable accommodations

12  that the defendant public entity failed to provide. *See id.* at 978.

13       To prove that a public program or service violated Title II of the ADA, the plaintiff must

14  show: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to

15  participate in or receive the benefit of some public entity's services, programs, or activities; (3) the

16  plaintiff was either excluded from participation in or denied the benefits of the public entity's

17  services, programs or activities, or was otherwise discriminated against by the public entity; and

18  (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

19  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *see also Duvall v. County of Kitsap*, 260 F.3d

20  1124, 1134 (9th Cir. 2001). Essentially the same showing is required to state a cause of action under

21  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *See Olmstead v. Zimring*, 527 U.S. 581,

22  589-91 (1999); *Duvall*, 260 F.3d at 1135. As the parties have not indicated any relevant difference

23  between the ADA and Rehabilitation Act analyses for Mr. Curry's claims, the claims will be

24  addressed together, as they frequently are. *See Duvall*, 260 F.3d at 1135.

25       2.    Special Requirements Apply To This Action For Damages

26       Damages are not available for a violation of Title II of the ADA or the Rehabilitation Act

27  absent a showing of discriminatory intent by the defendant. *See Ferguson v. City of Phoenix*, 157

28  F.3d 668, 674 (9th Cir. 1998). To show discriminatory intent, a plaintiff must establish deliberate

United States District Court

For the Northern District of California

indifference by the public entity. *Duvall*, 260 F.3d at 1138. Deliberate indifference requires: (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Id.* at 1139. The first prong is satisfied when the plaintiff identifies a specific, reasonable and necessary accommodation that the entity has failed to provide, and the plaintiff notifies the public entity of the need for accommodation or the need is obvious or required by statute or regulation. *Id.* The second prong is satisfied by showing that the entity deliberately failed to fulfill its duty to act in response to a request for accommodation. *Id.* at 1139-40. The entity's duty is to undertake a fact-specific investigation to gather from the disabled individual and qualified experts sufficient information to determine what constitutes a reasonable accommodation, giving "primary consideration" the requests of the disabled individual. *Id.* The second prong is not satisfied if the failure to fulfill this duty to accommodate is a result of mere negligence, such as "bureaucratic slippage" or where the entity simply "overlooked" a duty to act. *Id.*

Mr. Curry's claims under the ADA and Rehabilitation Act seek damages for the alleged denial of reasonable accommodations from December 31, 2004 through October 2006.[6] Mr. Curry received the requested accommodation in October 2006, and therefore does not seek injunctive relief. His request for declaratory relief that the acts of Defendants violated federal law is dismissed as moot in light of his receipt of the requested accommodation. *See Duvall*, 260 F.3d at 1132 n.4. The fact that this is an action for damages affects the showing that Mr. Curry must make because, as explained above, the ADA/RA plaintiff can obtain damages only if he shows Defendant's conduct resulted from deliberate indifference to his rights under the ADA/RA.

3.      Applying The Right Law

The ADA was amended by the ADA Amendments Act of 2008 ("ADAAA"), *see* Pub. L. No. 110-325, 122 Stat. 3553 (2008). One of the main purposes of the ADAAA was to repudiate the Supreme Court's narrowing interpretations of the term "disability" in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and the scope of protection intended to be afforded by the ADA in *Toyota*

---

[6] Mr. Curry requested nominal, compensatory, and punitive damages. Only nominal and compensatory damages are possible because punitive damages are not available in an action under Title II of the ADA or the RA. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

United States District Court

For the Northern District of California

1   *Motor Mfg. v. Williams*, 534 U.S. 184 (2002).  The ADAAA, which took effect on January 1, 2009,

2   does not apply retroactively.  *See Becerril v. Pima County Assessor's Office*, 587 F.3d 1162 (9th Cir.

3   2009).  Thus, for purposes of analyzing Mr. Curry's claim, the Court applies the law as it existed in

4   2004 - 2006, when Defendants made the challenged decisions.  *See Johnson v. Board of Trustees of*

5   *the Boundary County School Dist. No. 101*, 666 F.3d 561, 564 n.2 (9th Cir. 2011).

6        As of 2004, a disability was defined in the ADA as "a physical or mental impairment that

7   substantially limits one or more of the major life activities of such individual," having "a record of

8   such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(2).

9   *Toyota* had construed the term "substantial" to preclude impairments that interfere in only a minor

10  way with a major life activity.  *Toyota*, 534 U.S. at 196-97; *see also Sutton*, 527 U.S. at 490-91

11  (noting that minor limitations on a major life activity, such as one's height, build or singing voice,

12  do not constitute an impairment).  According to *Toyota*, the term "major life activities" "refers to

13  those activities that are of central importance to daily life." *Id.* at 197.  For example, "to be

14  substantially limited in performing manual tasks, an individual must have an impairment that

15  prevents or severely restricts the individual from doing activities that are of central importance to

16  most people's daily lives," *id.* at 198; a showing that a manual disability impeded the plaintiff's

17  ability to perform a class of manual tasks or the manual task required at the plaintiff's job is

18  insufficient, *id.* at 200.

19        The parties apparently failed to appreciate the significant impact of the ADAAA, as they

20  have mixed together the current version of § 12102(2) with citations to authorities addressing the

21  pre-ADAAA version of that statute. *See, e.g.,* Docket # 45, p. 16; Docket # 58, p. 9.  The Court will

22  analyze Mr. Curry's claims with reference to the law as it existed in 2004-2006, and that includes

23  the *Toyota* decision.

24        4.   Analysis

25        Mr. Curry contends that Defendants violated his rights under the ADA and Rehabilitation

26  Act during the December 30, 2004 through October 2006 period by excluding him from the DPP

27  and IAP, and by denying him the reasonable accommodation of inmate assistance through the IAP.

28

United States District Court

For the Northern District of California

1   Defendants urge that Mr. Curry was not qualified for the DPP or IAP and they were not obligated to

2   provide him an inmate assistant.

3         The undisputed evidence shows that Mr. Curry has an upper right arm paralysis, but there is

4   no evidence that Mr. Curry is mobility impaired.[7]  Viewing the evidence in the light most favorable

5   to Mr. Curry, the evidence shows that prison officials made several determinations regarding him:

6   (1) on July 12, 2002, Mr. Curry was designated as being "mobility impaired" and as having an

7   "other" disability "impacting placement," which resulted in his placement in the DPP; (2) on

8   December 30, 2004, Mr. Curry was designated as having a "permanent disabilit[y] not impacting

9   placement," which resulted in his exclusion from the DPP; (3) on September 27, 2005, Mr. Curry

10  was determined to have neither a permanent disability impacting placement nor a permanent

11  disability not impacting placement; and (4) on October 19, 2006, a prison doctor wrote a chrono

12  authorizing Mr. Curry to receive assistance when needed to carry heavy cumbersome objects but did

13  not put him back in the DPP.

14        Mr. Curry has failed to show a triable issue of fact that Defendants acted with deliberate

15  indifference to his ADA/Rehabilitation Act rights when they caused him to be excluded from the

16  DPP and IAP.  "[M]erely having an impairment does not make one disabled for purposes of the

17  ADA.  Claimants also need to demonstrate that the impairment limits a major life activity," and that

18  limitation must be substantial.  *Toyota*, 534 U.S. at 195.  Defendants did not question that the upper

19  arm paralysis existed and instead determined in December 2004 and later, that it did not

20  substantially limit a major life activity.  That determination was consistent with *Toyota*'s

21  _____

22      [7] "Mobility" is defined in the Oxford English online dictionary as "the ability to move or to be
moved; capacity for movement or change of place; movableness; portability."  *See* http://oed.com (last

23  visited March 14, 2012).  Although mobility impairment is not defined in the ADA or regulations, the
term currently is used to refer to an impairment of one's ability to move about or walk:

24              With regard to the term "mobility impairments," the Department intended

25              a broad reading so that a wide range of disabilities, including circulatory
              and respiratory disabilities, that make walking difficult or impossible,

26              would be included.  In response to comments on this issue, the
              Department has revisited the issue and has concluded that the most apt

27              term to achieve this intent is "mobility disability."

28  28 C.F.R. Pt. 35, App. A, Guidance to Revisions To ADA Regulation On Nondiscrimination On The
Basis Of Disability In State And Local Government Services, published Sept. 15, 2010.

United States District Court

For the Northern District of California

1    determination that major life activities were activities that were "of central importance to daily life."

2    *Id* at 197.

> 3    In order for performing manual tasks to fit into this category–a
> category that includes such basic abilities as walking, seeing, and
> 4    hearing–the manual tasks in question must be central to daily life.  If
> each of the tasks included in the major life activity of performing
> 5    manual tasks does not independently qualify as a major life activity,
> then together they must do so.

6

7    *Id.*

8    It is not disputed that Mr. Curry cannot carry heavy things.  However, a person's inability to

9    carry heavy things is not "an impairment that prevents or severely restricts the individual from doing

10    activities that are of central importance to most people's daily lives."  *See id.* at 198; *cf. id.* at 202

11    (evidence that the plaintiff's medical conditions "caused her to avoid sweeping, to quit dancing, to

12    occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and

13    drives long distances" were changes in her life that "did not amount to such severe restrictions in the

14    activities that are of central importance to most people's daily lives that they establish a manual task

15    disability as a matter of law.").  To be sure, Mr. Curry's arm paralysis may have affected more than

16    just his ability to carry heavy things, but the parties have concentrated their presentations on that

17    function.  While the original CDC-1845 indicated that Mr. Curry had unspecified problems with

18    showering, dressing and eating, Mr. Curry provides no evidence as to the extent of those problems to

19    show a triable issue of fact that they severely restricted him from doing activities of central

20    importance to most people's lives.  Moreover, he had received accommodations for at least the

21    showering activity, and had declined help from the IAP in 2003 when he was still in the DPP,

22    indicating he did *not* need assistance with dressing or eating.

23    Even if Plaintiff raised a triable issue of fact that he was disabled, Mr. Curry must establish

24    that Defendants acted with deliberate indifference in violating his rights.  Given *Toyota*'s restrictive

25    definition of disability, reasonable prison officials could reasonably have concluded that an inmate

26    in Mr. Curry's position was not disabled for purposes of the ADA or Rehabilitation Act.

27    *See Becerril*, 587 F.3d at 1164 (applying pre-ADAAA law and rejecting failure-to-accommodate

28    claim by plaintiff with temporomandibular disorder; plaintiff "was not substantially limited in

United States District Court

For the Northern District of California

1   speaking because she was limited only in talking constantly, for a long time, and under stress," and

2   was not "substantially limited in eating because eating hard foods is not 'of central importance to

3   daily life' . . . and an inability to eat hard foods is not substantially limiting"). Denying such an

4   inmate's request to be put back in the DPP or to be deemed eligible for IAP assistance under these

5   circumstances would not have been the result of deliberate indifference to Mr. Curry's rights under

6   the disability laws. Thus, even viewing the evidence in Mr. Curry's favor, he failed to raise a triable

7   issue of fact as to whether Defendants acted within deliberate indifference in denying his request to

8   be put back in the DPP.

9           Further undermining the assertion that Defendants acted with discriminatory intent is the fact

10  that Defendants acted pursuant to the *Armstrong* Remedial Plan, which had criteria for inclusion in

11  the DPP that Mr. Curry did not meet. Specifically, Mr. Curry did not meet the *Armstrong* Remedial

12  Plan criteria for a disability impacting placement because he did not "use wheelchairs full or part

13  time due to a permanent disability," Docket # 65-1. p. 10; did not "have a permanent lower

14  extremity mobility impairment that substantially limits walking," *id.* at 11; was not permanently

15  hearing impaired, vision impaired, or speech impaired, *id.*; and did not have "a disability other than

16  [the foregoing], e.g., emphysema or other upper respiratory condition, which due to the severity of

17  their disability may require special placement in a designated DPP facility," *id.* Mr. Curry also did

18  not meet the *Armstrong* Remedial Plan criteria for a disability *not* impacting placement because he

19  did not have a "permanent mobility impairment," which was described as "[i]nmates/parolees with

20  permanent lower extremity mobility impairments who can walk 100 yards and up a flight of stairs

21  without pausing, with or without aids;" did not have a "permanent nonambulatory impairment,"

22  which was described as having "an arm or hand prosthesis, or missing digits" (and did not receive a

23  specific category code in any event), *id.*; and did not have any of the described less severe

24  permanent hearing, vision, or speech impairments, *id. See* Docket # 65-1, pp. 10-12.

25          Prison officials cannot avoid liability by formulating policies that are contrary to federal law

26  and then claim reliance on such policies. *Cf. California Attorneys For Criminal Justice v. Butts*, 195

27  F.3d 1039 (9th Cir. 1999) (police officers not entitled to qualified immunity for reliance on training

28  and training materials where they were trained to violate constitutional rights). However, the

1   *Armstrong* Remedial Plan is not a homespun CDCR policy intended to avoid ADA and

2   Rehabilitation Act obligations. The *Armstrong* Remedial Plan is a court-ordered remedial plan in a

3   prisoner class action in which Mr. Curry is a member of the plaintiff class. Defendants' compliance

4   with the guidelines contained in the *Armstrong* Remedial Plan, a court-approved plan of action

5   regarding access to services and programming for qualified disabled inmates in CDCR and the DPP,

6   did not amount to deliberate indifference to Mr. Curry's federal rights. *Cf. Krug v. Lutz*, 329 F.3d

7   692, 699 (9th Cir. 2003) (prison officials acting under provisions of a consent decree were entitled to

8   qualified immunity).

9          Mr. Curry also urges that he was removed from the DPP because of his disability. However,

10  he has not shown a triable issue of fact that he was otherwise qualified for the DPP; that is, he has

11  not identified any DPP category in the *Armstrong* Remedial Plan that covered his arm paralysis. Mr.

12  Curry's exclusion from the DPP was not based on the fact or perception that he had a disability and

13  instead was due to the fact that he did *not* have a qualifying disability. *See Weinreich*, 114 F.3d at

14  979 (patron excluded from public transit system's reduced fare program due to his failure to provide

15  updated medical information failed to establish ADA or Rehabilitation Act violation because transit

16  system's policy did not discriminate on the basis of a disability and was not required to make

17  reasonable modifications to the eligibility requirements for patron).

18         The evidence before court also does not show a triable issue of fact that the denial of an

19  inmate assistant from December 30, 2004 through October 2006 amounted to deliberate

20  indifference. Not only, as discussed above, does the record establish the CDCR and Salinas Valley

21  officials could reasonably have thought Mr. Curry was not disabled under the ADA under the law as

22  it existed in 2004-2006, Mr. Curry does not dispute that CDCR and Salinas Valley officials did

23  provide numerous accommodations for his condition – *e.g.*, an extra mattress, a lower bunk, no triple

24  bunk, a shower chair, extra time to shower, an arm sling and an exercise band. This indicates that

25  they did not act with deliberate indifference in denying him additional services.

26         Mr. Curry appears to argue that, since a CDCR official once designated him as mobility

27  impaired, CDCR officials never were allowed to change the designation and that the failure to re-

28  designate him violates the ADA. He offers no legal support for such a proposition. To say that

1   prison officials may never change a designation would be illogical, as it would require an initial

2   mistake to be perpetuated regardless of its correctness.  Here, the record amply establishes Mr.

3   Curry was, in fact, not mobility impaired and that there were reasonable grounds to believe his

4   impairment to his arm did not render him disabled within the meaning of the ADA.

5           Likewise, Mr. Curry failed to show a triable issue of fact that Defendants acted with

6   discriminatory intent when they caused him to become ineligible for the IAP by removing him from

7   the DPP.  The undisputed evidence shows that Mr. Curry did not meet the criteria for inclusion in

8   the IAP program once he was removed from the DPP because being in the DPP was a prerequisite

9   for participation in the IAP.

10          Insofar as he is attempting to argue that he was discriminated against because he was

11  regarded as having a disability, his argument fails.  The ADA did define disability to include not

12  only a person with a specified impairment, but also one who "has a record of such an impairment" or

13  is "regarded as having such an impairment," 42 U.S.C. §12102(2), but those alternative definitions

14  do not help Mr. Curry because he was not *excluded* from the DPP due to having a record of a

15  mobility impairment or being regarded as having a mobility impairment.

16          In sum, when the evidence and reasonable inferences therefrom are viewed in the light most

17  favorable to Mr. Curry, no reasonable jury could find that Defendants acted with the requisite

18  deliberate indifference when they made decisions that caused him to be excluded from the DPP and

19  the IAP, and denied him an inmate assistant.  Defendants are entitled to judgment as a matter of law

20  on the ADA and Rehabilitation Act claims.  The Court reiterates that this analysis is based on the

21  law as it existed in 2004-2006, before the ADA was amended by the ADAAA.

22  B.      Trip And Fall Claim

23          The Eighth Amendment's prohibition of "cruel and unusual punishments" imposes a duty on

24  prison officials to, among other things, "'take reasonable measures to guarantee the safety of the

25  inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517,

26  526-27 (1984)).  A prison official violates the Eighth Amendment only when two requirements are

27  met: (1) the deprivation is, objectively, sufficiently serious; and (2) the prison official is,

28  subjectively, deliberately indifferent to inmate safety.  *See Farmer*, 511 U.S. at 834.

United States District Court

For the Northern District of California

1  The test for deliberate indifference is the same as criminal recklessness, *i.e.*, the official must

2  actually know of and disregard an excessive risk to inmate safety.  *See id.* at 837.  The official "must

3  both be aware of facts from which the inference could be drawn that a substantial risk of serious

4  harm exists, and he must also draw the inference."  *Id.*  Neither negligence nor gross negligence

5  constitutes deliberate indifference.  *See id.* at  835-36 & n.4; *Estelle v. Gamble*, 429 U.S. 97, 106

6  (1976).  Mr. Curry's claim falters on both the objective and subjective prongs of the Eighth

7  Amendment test.

8  Mr. Curry has failed to raise a triable issue of fact that being required to descend stairs while

9  handcuffed and carrying a bag of legal materials in one's good arm satisfies the objective prong for

10  an Eighth Amendment violation.  "[E]very injury suffered by an inmate does not necessarily

11  translate into constitutional liability for prison officials."   *Osolinski v. Kane*, 92 F.3d 934, 936-37

12  (9th Cir. 1996).  "[O]nly those deprivations denying 'the minimal civilized measure of life's

13  necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson v.*

14  *Seiter*, 501 U.S. 294, 298 (1991) (citation omitted); *see, e.g., Osolinski*, 92 F.3d at 938 (defendants

15  entitled to qualified immunity against prisoner's Eighth Amendment claim stemming from second

16  degree burns suffered when oven door fell off its hinges and burned his arms); *Jackson v. State of*

17  *Arizona*, 885 F.2d 639, 641 (9th Cir. 1989) (slippery floors, by themselves, do not amount to cruel

18  and unusual punishment); *Connolly v. County of Suffolk*, 533 F. Supp. 2d 236 (D. Mass. 2008)

19  (summary judgment granted for defendants because ladderless bunk beds did not meet objective

20  component of Eighth Amendment in light of evidence that "[t]housands of . . . inmates access bunk

21  beds daily without the aid of a ladder and without incident" and only about a dozen injuries had been

22  reported).  Requiring an inmate to descend stairs while in waist restraints does not deny him the

23  minimal civilized measure of life's necessities.  Outside of prison, large numbers of people regularly

24  climb and descend stairs without falling, and large numbers of people regularly climb and descend

25  stairs with packages in their arms without falling.  Even viewing the evidence in the light most

26  favorable to Mr. Curry, no reasonable jury could find that descending stairs while restrained at the

27  waist and carrying a bag posed a substantial risk of serious harm to Mr. Curry.

28

1    Mr. Curry also has failed to raise a triable issue of fact on the subjective prong, *i.e.*, that

2   prison officials acted with deliberate indifference to a known risk to his safety.  Although Mr. Curry

3   did not need to show that Caropreso made him descend the steps "believing that harm actually

4   would befall" him, Mr. Curry was required to raise a triable issue of fact that Caropreso at least had

5   "knowledge of a substantial risk of serious harm."  *See Farmer*, 511 U.S. at 842.  Mr. Curry failed

6   to do so.

7    This is not a situation where the sheer obviousness of the danger allows an inference of

8   knowledge of a substantial risk of harm to the inmate.  *Cf. id.* (knowledge can be inferred from

9   obviousness of risk).  There is no evidence of a widespread problem of restrained inmates falling on

10   the stairs.  Mr. Curry's statement "upon information & belief" that "several inmates have fell down

11   the stairs while in restraints over time, which makes this pervasive at this prison," Curry #1 Decl., ¶

12   16, is insufficiently probative to show a triable issue of fact. There also is no evidence of anything

13   physically unusual about the steps, such as being slippery or dimly lit.

14    Mr. Curry's evidence that Caropreso denied his request for assistance carrying his legal

15   materials does not show a triable issue of fact on the subjective prong because he presents no

16   evidence that his request was due to a safety concern about tripping or that he ever informed

17   Caropreso that he thought he might trip.  *See generally Gill v. Mooney*, 824 F.2d 192 (2d Cir. 1987)

18   (prisoner injured when he fell off an unsafe ladder failed to state a claim against a defendant who did

19   not have any prior notice of the unsafe ladder but did state a claim against another defendant who

20   ordered plaintiff to continue working after plaintiff informed him the ladder was unsafe) .  Further,

21   this is not an instance of an inmate being required to tote a heavy object as a job requirement.  Mr.

22   Curry chose the bag and chose what to put in it for his visit to the law library.  The fact that he

23   loaded up the bag suggests that he did not think it beyond his ability to carry, as he had been denied

24   help carrying things for more than a year before this incident.  And Mr. Curry had sufficient extra

25   capacity to carry an extra book with him to drop off in a neighboring cell.

26    The disagreements between the parties about the kind of restraints Mr. Curry was supposed

27   to be in and the kind he was actually put in do not raise a triable issue of fact because there is no

28   evidence that Mr. Curry would have been able to avoid the fall any better if he was in waist

1    restraints rather than the less restrictive Martin chain.  Nor is there any evidence that Caropreso

2    knew that one type of restraint increased the likelihood of a fall or injury in a fall.  The evidence is

3    undisputed that the Martin chain allowed an inmate's hands to move more freely around his waist

4    whereas the waist restraints would have had his hands secured to his hip area.

5         Mr. Curry's evidence that, contrary to escort policy, Caropreso did not have his hand on Mr.

6    Curry when they descended the steps does not raise a triable issue of fact because the evidence

7    shows that the policy of a hand-on escort was to prevent a breach of security and not to prevent falls.

8    There is no evidence that Caropreso knew that not having a hand on Mr. Curry during the escort

9    presented a substantial risk to the inmate's safety.  Mr. Curry has not raised a triable issue of fact

10   that Caropreso knew of facts from which the inference could be drawn that a substantial risk to Mr.

11   Curry's safety existed and disregarded it when he escorted Mr. Curry in the Martin chain down the

12   stairs while Mr. Curry was carrying a bag of legal materials.

13        There is no evidence that Defendants Evans or Ponder failed to properly train Caropreso in

14   escorting inmates.  Nor is there any evidence that they were aware of a substantial risk of serious

15   harm to inmates who had to descend stairs in restraints at the prison.

16        In sum, viewing the evidence and inferences therefrom in the light most favorable to Mr.

17   Curry, he has not raised a triable issue of fact in support of his claims that Defendants acted with

18   deliberate indifference to a substantial risk of serious harm.  Defendants are entitled to summary

19   judgment in their favor on the Eighth Amendment claim.

20   C.    Qualified Immunity

21        Defendants also are entitled to qualified immunity against the Eighth Amendment claim.

22   The defense of qualified immunity protects government officials "from liability for civil damages

23   insofar as their conduct does not violate clearly established statutory or constitutional rights of

24   which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

25   To determine whether an official is entitled to qualified immunity, the court must decide whether the

26   facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would

27   be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier*

28   *v. Katz*, 533 U.S. 194, 20102 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling

1    *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence).  "[I]f no

2    constitutional right would have been violated were the allegations established, there is no necessity

3    for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.

4          The Court has concluded that the evidence fails to show a violation of Mr. Curry's Eighth

5    Amendment rights.  Therefore, Defendants prevail on the first prong of the *Saucier* test.  As a matter

6    of law, Defendants are entitled to qualified immunity against the Eighth Amendment claim.

7          Even if a constitutional violation were established, the second step under *Saucier* requires the

8    Court to consider whether the contours of the right were clearly established under the law, an

9    inquiry that "must be undertaken in light of the specific context of the case, not as a broad general

10   proposition."  *Saucier*, 533 U.S. at 201.  In this regard, the law was clearly established that a

11   correctional officer could not disregard a substantial risk of serious harm to an inmate of which he

12   was aware and had a duty to protect an inmate from violence at the hands of other inmates.  *See*

13   *Farmer v. Brennan*, 511 U.S. at 833.  On the day of the incident, as a general matter, "it would have

14   been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety,

15   and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he

16   would violate the law by disregarding it."  *Estate of Ford v. Ramirez- Palmer*, 301 F.3d 1043, 1050

17   (9th Cir. 2002).

18         The qualified immunity analysis for a deliberate indifference claim requires a greater

19   showing.  In *Estate of Ford*, the court explained that, for an Eighth Amendment violation based on a

20   condition of confinement (such as a safety risk), the official must *subjectively* have a sufficiently

21   culpable state of mind, *i.e.*, "'a prison official cannot be found liable under the Eighth Amendment

22   for denying an inmate humane conditions of confinement unless the official knows of and disregards

23   an excessive risk to inmate health or safety; the official must both be aware of facts from which the

24   inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

25   inference.' . . .  Thus, a reasonable prison official understanding that he cannot recklessly disregard a

26   substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive

27   that the exposure in any given situation was not that high.  In these circumstances, he would be

28   entitled to qualified immunity.  *Saucier*, 533 U.S. at 205."  *Estate of Ford*, 301 F.3d at 1050 (quoting

*Farmer v. Brennan*, 511 U.S. at 834).  Here, there is nothing to suggest that Caropreso had reason to and did perceive there was a substantial risk of serious harm to the inmate.

Nothing in the facts or the law put Defendants on notice that their conduct would be clearly unlawful.  Thus, summary judgment based on qualified immunity is appropriate.  *See Saucier*, 533 U.S. at 202.  Defendants met their burden of proof in their moving papers and Mr. Curry did not introduce evidence to show the existence of a genuine issue of fact on the defense.  Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. (Docket # 45.)  Judgment will be entered in favor of Defendants and against Plaintiff on the § 1983, ADA, and Rehabilitation Act claims.  Having resolved all the federal question claims, the Court declines to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).

The Clerk shall close the file.


IT IS SO ORDERED.


Dated:  March 21, 2012

_____
EDWARD M. CHEN
United States District Judge